HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| ALEXANDRO ALVARADO-YOUNG, et al. <br><br> Plaintiffs, <br><br> v. <br><br> STATE OF WASHINGTON, et al., <br><br> Defendants. | CASE NO. C15-5883-RBL <br><br> ORDER GRANTING PARTIAL DEFENDANTS' MOTION TO DISMISS <br><br> DKT. #21 |

THIS MATTER is before the Court on Defendants Department of Social & Health Services, Child Protective Services, Jennifer Hoerner, Christina Murillo, and the State of Washington's Motion for Summary Judgment [Dkt. 21]. This case considers whether three-year old A.A. and her one-year old brother W.A. were properly removed from the custody of their parents, Plaintiffs Alexandro and Angela Alvarado-Young. The Alvarado-Youngs claim the Defendants' actions in taking custody of their children and initiating dependency proceedings violated their rights to be free from unconstitutional searches and seizures, the use of excessive force, and interference with their familial association, as well as a host of state law claims. Defendants contend they did not violate the Alvarado-Youngs' rights or tortiously harm them because the police alone took A.A. and W.A. into protective custody, and once they did so, the

1  Defendants were statutorily obliged to care for the children by initiating dependency
2  proceedings. They claim qualified immunity.

3       On Friday, March 29, 2013, Department of Social and Health Services social worker
4  Jennifer Hoerner visited a daycare operated by Lillian Vazquez-Hanson. Hoerner noticed one
5  child, W.A., had bruising and cuts on his face. She told Vazequez-Hanson to report W.A.'s
6  injuries to DSHS's Child Protective Services, which Vazquez-Hanson did on Monday. She
7  provided the caveats that W.A.'s mother had told her he had fallen at home, and she did not think
8  he was being abused. CPS assigned the case to social worker Christina Murillo.

9       Murillo called Vazquez-Hanson the next morning to say she would visit the daycare to
10 check on W.A. and to photograph his injuries. The Alvarado-Youngs overheard the call, told
11 Vazquez-Hanson they did not want the State photographing their children, and left with them.
12 Murillo called Angela later that day, asking to see W.A., and Angela referred her to her attorney.

13      The next day, Tacoma Police Detective Paula Kelley accompanied Murillo to the
14 daycare. The Alvarado-Young children were absent, so Kelley and Murillo went to their house.
15 Angela answered the door when Kelley knocked, but did not let her or Murillo inside to check on
16 W.A. because they did not have a warrant, referring them again to her attorney. Kelley called for
17 assistance of patrol officers and a supervisor. She walked through the neighbor's yard to the
18 other side of the house, where Alexandro was. She spoke to him across a fence, reiterating that
19 she and Murillo were there to conduct a welfare check.

20      Back-up arrived and noticed that Alexandro had a gun. Sergeant Roberts yelled for him
21 to keep his hands visible. Alexandro held his cell phone to his ear with his right hand, and he
22 repeatedly put his left hand in his pocket. Alexandro alleges he was attempting to produce his
23 wallet with his concealed pistol license, which he says he did. Defendants allege that Alexandro
24

then turned to walk back into his house, and so Roberts and Kelley seized him for allegedly violating their commands. They arrested him for obstruction. Angela still did not open the door to allow a welfare check of W.A., so officers broke it. Kelley arrested Angela for obstruction and took protective custody of the children. Custody was immediately transferred to Murillo, who during Alexandro's exchange with the police had been hiding behind a squad car. Murillo picked W.A. off of Angela's lap, and an officer carried A.A. outside.

Alexandro and Angelo were taken to separate jails, and their children were taken to the DSHS office. Murillo observed A.A. had a large bruise to her right temple. Besides the bruising and cuts that she had earlier observed on W.A.'s face, Murillo also noticed W.A. had bruises on his legs and second-degree, blistered burns on both ankles. Alexandro was released on bail that night, and Angela was released a few hours later in the early morning.

That Friday, April 5, Murillo filed dependency petitions for W.A. and A.A. and asked the Pierce County Juvenile Court to place them in shelter care. The court concluded there was a risk of imminent harm to the children, and services could not be offered to the Alvarado-Youngs to keep their children at home. It took W.A. and A.A. into custody and placed them in foster care. At the shelter care hearing approximately one week later, the Alvarado-Youngs agreed to participate in a supervision-program, which permitted DSHS to visit their home unannounced and required the Alvarado-Youngs to use a new daycare. The court allowed the children to return home that day. The Alvarado-Youngs allege Angela lost her ability to lactate in the interim. The state dismissed the children's dependency action approximately one month later, and the City of Tacoma dropped its criminal charges against the Alvarado-Youngs.

The Alvarado-Youngs throw the book of claims at Defendants. They maintain that by entering their home without a warrant, taking their children, and initiating dependency

1  proceedings, the Defendants violated their constitutional rights to be free from unreasonable
2  searches and seizures, excessive force, and interferences with their familial association. They
3  allege related *Monell* claims. The Alvarado-Youngs also argue that the Defendants' actions give
4  rise to state law claims of negligent investigation, trespass, malicious civil prosecution,
5  interference with family relations, negligent infliction of emotional distress, and outrage.[1]

6        The Defendants argue they are not liable for the police officers' decision to take the
7  children into custody, and once the officers did, Defendants had a statutory obligation to care for
8  the children, including initiating dependency proceedings. They argue they are immune from
9  suit. They also argue that because Murillo and Hoerner are not liable to the Alvarado-Youngs,
10 DSHS cannot be vicariously liable, and *Monell* claims do not apply to states or their agencies.
11 The Alvarado-Youngs provide few arguments to the contrary, although they do supply their
12 version of the facts, which in the main are not in dispute.

13                                      **DISCUSSION**

14 **A.**    **Standard of Review**

15       Summary judgment is proper "if the pleadings, the discovery and disclosure materials on
16 file, and any affidavits show that there is no genuine issue as to any material fact and that the
17 movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether
18 an issue of fact exists, the Court must view all evidence in the light most favorable to the
19 nonmoving party and draw all reasonable inferences in that party's favor. *See Anderson v.*
20 *Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *see also Bagdadi v. Nazar*, 84 F.3d 1194,

21

22
23     [1] The Alvarado-Youngs also assert claims against Defendants City of Tacoma, Tacoma Police Department, Detective Paula Kelly, and the police officers who responded to Kelly's call for assistance. They do not join in this motion, and many of the facts surrounding the police
24 officers' involvement have not been relayed to the Court.

1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *See Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. The moving party bears the initial burden of showing no evidence exists that supports an element essential to the nonmovant's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323–24.

**B.     Qualified Immunity.**

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982)). It shields an official "from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances confronted. Even if the [official's] decision is constitutionally deficient, qualified immunity shields her from suit if her misapprehension about the law applicable to the circumstances was reasonable." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). The purpose of the doctrine is "to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009). Because "it is inevitable that

law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present," qualified immunity protects officials "who act in ways they reasonably believe to be lawful." *Garcia v. Cty. of Merced*, 639 F.3d 1206, 1208 (9th Cir. 2011). It "gives ample room for mistaken judgments" and protects "all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224 (1991); *see also Ashcroft v. al–Kidd*, 563 U.S. 731, 743, 131 S. Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092 (1986)).

Qualified immunity protects government officials not just from liability, but from suit: "it is effectively lost if a case is erroneously permitted to go to trial," and thus, the claim should be resolved "at the earliest possible stage in litigation." *Anderson v. Creighton*, 483 U.S. 635, 640 n.2, 107 S. Ct. 3034 (1987). The Supreme Court has endorsed a two-part test for resolving such claims: a court must decide (1) whether the facts that a plaintiff has alleged "make out a violation of a constitutional right," and (2) whether the "right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (referencing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151 (2001)). Courts may address these two prongs in either order. *See id.*, 555 U.S. at 236.

**C.     Federal Claims**

The Alvarado-Youngs claim, without additional specificity or support, that by entering their home without a warrant, taking their children, and initiating dependency proceedings, the Defendants violated their constitutional rights to be free from unreasonable searches and seizures, excessive force, and interferences with their familial association. The Defendants argue the police, not them, took the children into protective custody; Murillo properly entered the Alvarado-Youngs' home under the exigent circumstances exemption to the warrant requirement

because their children needed to be cared for after they were arrested; and Murillo's only physical interaction with the Alvarado-Youngs was picking W.A. off of Angela's lap, a non-forceful act; and Murillo has quasi-prosecutorial immunity for initiating depending proceedings.

To state a claim of a violation of federal rights under 42 U.S.C. § 1983, a plaintiff must set forth specific factual bases showing (1) the conduct complained of was committed by a person acting under color of state law; and (2) this conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or by laws of the United States. *See Parratt v. Taylor*, 451 U.S. 527, 535, 101 S. Ct. 1908 (1981) *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986); *see also Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 10980). Implicit in this second element is an element of causation; the constitutional violation must have caused the deprivation of rights. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 286, 97 S. Ct. 568 (1977).

None of the Alvarado-Youngs' federal claims against these Defendants are viable. First, Hoerner's only involvement was to remind Vazquez-Hanson of her duty as a licensed childcare provider to report W.A.'s injuries to CPS. This act alone does not, and cannot, constitute a violation of the Alvarado-Youngs' constitutional rights. The Alvarado-Youngs' § 1983 claims against her are DISMISSED with prejudice.

Second, Washington State and DSHS (including the CPS division) are not persons, and so cannot be sued under 42 U.S.C. § 1983. *See Spurrel v. Block*, 40 Wash. App. 854, 864, 701 P.2d 529 (1985) (State agencies, such as DSHS, are not "persons" within the meaning of the Civil Rights Act of 1871.). Nor can they be sued under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 98 S. Ct. 2018 (1978), which declared only municipalities and local government units, not states and their agencies, to be "persons" to whom the Civil

Rights Act applies. Therefore, the Alvarado-Youngs' § 1983 and *Monell* claims against Washington State and DSHS are DISMISSED with prejudice.

Third, Murillo was not responsible for removing A.A. and W.A. from their home. As a social worker, she must investigate suspected child abuse. *See* RCW 26.44.050. She did only that while at the Alvarado-Youngs' house—indeed, she hid behind a car during the officers' altercations with Alexandro and Angela—until the police had entered the house, transferred custody of the children to DSHS, and directed her to pick W.A. off Angela's lap.[2] Because she did not arrest the Alvarado-Youngs or decide to remove their children from their control, Murillo did not cause, and is not liable for, the Alvarado-Youngs' familial separation. *See In re Scott Cty. Master Docket*, 672 F. Supp. 1152, 1166 (D. Minn. 1987), *aff'd sub nom. Myers v. Scott Cty.*, 868 F.2d 1017 (8th Cir. 1989) (where officers arrested and decided to remove children from their home, social worker was not "but for cause" of the alleged violation of parents' liberty interests in the care, custody, and management of their children). She also did not violate their right to be free from excessive force, as the Alvarado-Youngs have alleged no facts suggesting Murillo used excessive force on Angela or W.A. when picking up W.A.

Moreover, Murillo has qualified immunity for entering the Alvarado-Youngs' house to collect W.A. at the officers' instruction and for initiating dependency proceedings. A reasonable social worker would defer to officers' instructions and not second-guess their decision to enter a house without a warrant. *See Jordan v. Murphy*, 145 F. App'x 513, 518 (6th Cir. 2005) (social

---

[2] The propriety of the Alvarado-Youngs' arrest and of the police's resultant decision to take the children into custody are not presently before the Court; those questions will be briefed and considered if the police officers and the City seek dismissal of the claims against them. The Court only answers here whether Murillo violated the Alvarado-Youngs' clearly established constitutional rights by entering their home after they had been arrested and collecting their child, who the police had transferred to DSHS's custody.

1  worker had qualified immunity for entering plaintiff-guardian's house with officers without a

2  warrant). By reasonably relying on the officers' decisions and her duty to investigate suspected

3  child abuse, Murillo was not plainly incompetent. Finally, she had a statutory obligation to seek a

4  court order placing the children in shelter care. *See* RCW 13.34.060(1) (requiring a child taken

5  into custody to be placed in shelter care immediately). She has quasi-prosecutorial immunity for

6  doing so. *See Meyers v. Contra Costa Cty. Dep't of Soc. Servs.*, 812 F.2d 1154, 1156–57 (9th

7  Cir. 1987) (holding that social workers are entitled to absolute immunity in performing quasi-

8  prosecutorial functions associated with the initiation and pursuit of child dependency

9  proceedings). The federal claims against her are therefore DISMISSED with prejudice.

**C.     State Claims**

11     The Alvarado-Youngs claim that by entering their home without a warrant, taking their

12  children, and initiating dependency proceedings, the Defendants also trespassed, negligently

13  investigated their children's welfare, interfered with their familial relations, caused them

14  emotional distress, maliciously prosecuted them, and committed the tort of outrage. Defendants

15  argue the Alvarado-Youngs cannot make out a single prima facie claim, but even if they could,

16  Defendants have statutory immunity.

17     Hoerner and Murillo did not act tortiously. Hoerner's only involvement was reminding

18  Vazquez-Hanson of her duty to report suspected child abuse. This action does not constitute a

19  tort violation. Similarly, Murillo's involvement was limited to ensuring A.A. and W.A. were

20  cared for after their parents were arrested and they were placed in DSHS custody. The Alvarado-

21  Youngs would have a better case against her if she instead had ignored her duties and left their

22  infant children alone in the house. Murillo's entry was to care for children in protective custody.

23  *See* RCW 13.34.060(1). The Alvarado-Youngs have not offered facts or arguments showing she

24

acted with malice or caused their damages. And Murillo is excused from tort liability for her emergent placement decisions. *See* RCW 4.24.595(1) (government officials are not liable in tort for their acts or omissions in emergent placement investigations). She, too, is not liable in tort. Finally, because Hoerner and Murillo are not liable in tort, DSHS cannot be liable under a respondeat superior theory. The Alvarado-Youngs' state law claims against Hoerner, Murillo, DSHS, and the State are DISMISSED with prejudice.

## CONCLUSION

Defendants DSHS, CPS, Hoerner, Murillo, and the State of Washington's Motion for Summary Judgment [Dkt. #21] is GRANTED, and the claims against them are DISMISSED with prejudice.

IT IS SO ORDERED.

Dated this 15th day of December, 2016.

                                                                          Ronald B. Leighton
                                                                          United States District Judge